Filed 3/3/16  P. v. Mills CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMES EDWARD MILLS,<br><br>    Defendant and Appellant. | B257145<br><br>(Los Angeles County<br>Super. Ct. No. KA101563) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Juan Carlos Dominguez, Judge.  Reversed and remanded with directions.

Elana Goldstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Noah Hill, Jessica C. Owen and Nathan Guttmar, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant James Edward Mills appeals from the judgment entered following his convictions by jury on count 1 – possession of a controlled substance (methamphetamine), and count 2 – possession of a smoking device, following the denial of his suppression motion. (Health & Saf. Code, §§ 11377, subd. (a), 11364.1, subd. (a)(1); Pen. Code, § 1538.5.)[1] The court suspended imposition of sentence and placed him on probation for 18 months. We reverse and remand with directions.

## ISSUES

Appellant claims the trial court (1) erroneously denied his Penal Code section 1538.5 suppression motion and (2) erroneously denied his *Pitchess*[2] motion.

## DISCUSSION

*The Trial Court Partially Erred by Denying Appellant's Suppression Motion.*

1. *Suppression Proceedings at the Preliminary Hearing.*

   a. *People's Evidence.*

      (1) *Events Leading to the Stop of the SUV.*

At appellant's preliminary hearing, appellant made a Penal Code section 1538.5 suppression motion and the magistrate indicated it would be heard concurrently with the preliminary hearing. Covina Police Officer Terrence Hanou testified as follows. About 4:20 p.m. on April 14, 2013, Hanou was in his marked police car on the west side of the Fairfield Motel in West Covina when appellant, nearby, saw him. Appellant had been walking from the lobby of the motel. Appellant quickly drove a Ford Escape SUV around the motel, onto the street, and stopped at a nearby Best Western Motel. Hanou conducted a traffic stop of the SUV. Hanou stopped the SUV because its registration tags had expired and Hanou believed 2014 tags on the SUV's license plate were fraudulent.

---

[1]     A detailed recitation of the facts of the offenses is unnecessary to resolve this appeal. It is sufficient to note that on April 14, 2013, in West Covina, appellant was driving a Ford Escape containing methamphetamine and a methamphetamine pipe.

[2]     *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

Moreover, when Hanou stopped the SUV, he thought it was suspicious that appellant had driven from one hotel to the next.

(2) *The Prolonging of the Detention Prior to the Search of the SUV.*

Hanou testified about the circumstances in which appellant revealed to Hanou that appellant had a firearm. Hanou testified he contacted appellant, the sole occupant of the SUV, and asked for his license, registration, and insurance. Hanou testified, "He *provided* the paperwork to me *and I asked* him if he was on probation or parole or *if he had any weapons in the vehicle*." (Italics added.) The following also occurred: "Q. [The Prosecutor]: . . . So you are asking him for documentation *and he hands* the documents to you; right? [¶] A. Correct. [¶] Q. At which time do you *ask* him whether he's on probation or parole and *if he has weapons in the car*? [¶] A. *At the same time*." (Italics added.) Appellant told Hanou that appellant had a "firearm inside the vehicle." When appellant said that, Hanou believed that maybe a crime was afoot. Appellant's counsel asked Hanou what crime, and he testified, "[p]ossession of a handgun, possession of a rifle, maybe it's possessed illegally, maybe he's a prior felon in possession of a handgun or a weapon. I don't know at that point, but I'm going to investigate it." Hanou called for backup.

Hanou testified in more detail concerning these events as discussed below. Appellant handed Hanou the appropriate papers, Hanou saw the SUV was validly licensed and the registration had been updated, and Hanou concluded the Department of Motor Vehicles (DMV) had not updated its computer. Hanou determined DMV had made a mistake. However, appellant was not free to leave because Hanou was still conducting his traffic stop. The following then occurred during cross-examination: "Q. And what was the basis of a traffic stop for registration violation after you determined the registration was valid? [¶] A. This area has numerous motels, and I had made numerous narcotics-related investigation arrests from this area. The fact that Mr. Mills was parked, saw me, had went around the north side of the [Fairfield Motel] building, had fled out the east side, onto Garvey, quickly darted into another motel raised suspicion of what he was doing."

3

Hanou also testified about these events as follows. It appeared appellant had valid registration. At that point Hanou was investigating why appellant went from one motel to another. The following then occurred: "Q. What criminal activity was Mr. Mills involved in? [¶] A. At the time of the stop, it was for fraud. [¶] Q. Okay. [¶] A. And we resolved that issue. But I *had* asked him he was on probation or parole and if any weapons. He told me he had a firearm in the vehicle." (*Sic*; italics added.)

Hanou provided additional detail. He testified he asked appellant "about probation and parole." The following occurred: "Q. And did you make note of whether, in your report, he told you he was on probation or parole? [¶] A. . . . [¶] He *told* me that he had a firearm in the vehicle *when I asked* those questions." (Italics added.) Hanou also testified that when he talked to appellant, Hanou immediately asked him six questions, i.e., "license, insurance, registration, parole, probation and weapons." The prosecutor asked why it was important to Hanou to know whether there was a firearm or any weapon in the vehicle that Hanou had stopped, and Hanou replied, "[f]or my safety and also for the safety for the occupant of the vehicle." Hanou did not remember if appellant told him where the weapon was.

After Hanou called for backup, another officer arrived and Hanou then had appellant exit the SUV. Hanou conducted a patdown search of appellant and found possible contraband, i.e., $10,000, in appellant's right back pocket. Hanou asked appellant for consent to search appellant's SUV but appellant refused to consent. Prior to the search of the SUV, appellant was "[o]n the front hood" of Hanou's police car and Hanou did not believe appellant was in handcuffs.

(3) *Hanou's Search of the SUV*.

Hanou also testified as follows. Hanou searched the vehicle for a weapon. He searched the vehicle against appellant's consent because a weapon was in the vehicle.

4

During the search of the SUV, Hanou found, inter alia, the subject methamphetamine and methamphetamine pipe, as well as a shotgun and ammunition.[3]

Hanou also testified as follows. The cargo area was immediately accessible to appellant. The weapon was immediately accessible to appellant because he was driving an SUV that had no trunk but only a cargo area behind a second row of seats. Appellant could not have reached the firearm from the driver's seat but could have reached it if he had crawled out the driver's seat and into the back. Following the search of the SUV, appellant was arrested. Hanou carried a cell phone when patrolling but did not remember whether he used it during the stop.

b. *Defense Evidence.*

Appellant testified, in pertinent part, as follows. Appellant was driving the SUV and Hanou stopped him. Hanou first asked appellant if he was on parole or probation, and appellant replied no. Hanou then asked if appellant had ever been arrested, and appellant replied no. Hanou then asked if appellant had his driver's license, registration, and insurance. Appellant replied yes and presented them to Hanou. Hanou told appellant the registration was valid. Hanou asked appellant for consent to search his vehicle and appellant refused to give it. Hanou walked away, spoke with someone on a cell phone, and returned. Hanou asked appellant if he had any "weapons" in the car. Appellant replied yes. Appellant said "it" was in the back where it belonged and told Hanou the weapon was not loaded. The weapon was in the cargo area of the SUV. Hanou went and made another call, returned, and asked appellant to exit the SUV. Appellant complied. Hanou immediately handcuffed appellant and conducted a patdown search.

---

[3]     In particular, Hanou testified he found an "unloaded 12-gauge Remington shotgun in the rear cargo area next to approximately 125 rounds of ammunition." Hanou also testified "[i]n the center console I found a baggie of methamphetamine and also in the rear cargo area in the luggage container I found another large baggie of methamphetamine and a methamphetamine pipe." Hanou further testified concerning the large baggie of methamphetamine that it was found "inside the cargo area, inside the luggage."

5

c. *The Magistrate's Ruling.*

Following argument, the magistrate ruled as follows. Hanou's detention of appellant was lawful. Moreover, the prolonging of the detention was lawful. As to the prolonging, Hanou approached the SUV and was entitled to ask the six questions during the time it took to investigate the incident that caused Hanou to be there in the first place. When appellant was handing the documents to Hanou, Hanou knew a weapon was in the SUV and the registration was valid. Hanou was entitled to prolong the detention because, during the "primary detention," appellant said there was a weapon in the SUV. The search of the SUV was lawful under *Michigan v. Long* (1983) 463 U.S. 1032 [77 L.Ed.2d 1201] (*Long*). Moreover, because appellant said there was a firearm in the SUV, the search of the SUV for the firearm was lawful under *Arizona v. Gant* (2009) 556 U.S. 332 [173 L.Ed.2d 485] (*Gant*) and *United States v. Ross* (1982) 456 U.S. 798, 825 [72 L.Ed.2d 572] (*Ross*). The magistrate denied the suppression motion.

2. *Appellant's Renewed Suppression Motion.*

On May 29, 2014, appellant filed in the trial court a Penal Code section 1538.5 suppression motion. Appellant sought renewal of the motion based on evidence in a police dashboard camera video.[4] On June 3, 2014, pursuant to the parties' agreement, the trial court viewed the video, discussed below.

---

[4]    Where, as here, appellant's suppression motion was denied at the preliminary hearing and appellant renewed it before the trial court, the evidence at the special hearing in the trial court on the renewed motion was, pursuant to Penal Code section 1538.5, subdivision (i), limited, in this case, to the video (i.e., evidence presented that was "agreed to by all parties" (Pen. Code, § 1538.5, subd. (i)) plus the preliminary hearing transcript. The video was defense exhibit A. That exhibit, so designated, is not before this court. Appellant asserts People's exhibit No. 3, admitted into evidence *at trial*, is a dashboard camera video of the events. This court has viewed People's exhibit No. 3. There is no dispute there was only one video recording of the events, whether reflected in defense exhibit A or People's exhibit No. 3, nor is there any dispute People's exhibit No. 3 accurately reflects those events. People's exhibit No. 3 does not contain audio of any statements clearly identifiable as made by appellant or the police.

6

a. *The Video (People's Exhibit No. 3).*

People's exhibit No. 3 consists of the video and an accompanying video player. The exhibit reflects that the video recorded events beginning about 4:20 p.m. on April 14, 2013, and the video was about 33 minutes long. The exhibit, considered with Hanou's testimony, provides substantial evidence as follows.

(1) *Events from Appellant's Exit from His SUV to Franco Escorting Him Away from the Police Car.*

At 4:26 p.m., appellant exited his car and, during the next two minutes, the following occurred. Hanou and another officer (hereafter, Franco) handcuffed appellant, then Hanou, followed by Franco, escorted appellant to the front of the police car (which was behind the SUV). Hanou left appellant there with Franco, then Franco escorted appellant to the passenger side of the police car, permitting a citizen's car to back out and exit between the SUV and police car.[5]

(2) *Events from the Opening of the Cargo Door to Hanou's Initial Entry into the Driver's Area.*

Below are events from the time Hanou opened the SUV's rear door (cargo door) to the cargo area to the time he initially entered the driver's area (that entry being his first opportunity to search the center console and find methamphetamine). At "16:28:55" p.m.,[6] Hanou, behind the SUV, opened the cargo door. At 4:28:56, the reflections of appellant and Franco on the side of the citizen's car showed the two standing outside the passenger side of the police car. At 4:29:01, Hanou removed from the cargo area red luggage and, without opening it, put it on the ground behind the SUV. At 4:29:10, Hanou removed from the cargo area an open square box and looked in it in passing while putting

---

[5]     The citizen's car made a number of attempts to maneuver out of its parking place, obscuring some events before eventually leaving.

[6]     Hereafter, where the exhibit used military time, e.g., 16:28:55, we will use civilian time (4:28:55) with the understanding the events occurred in the afternoon. Subsequent references to areas (e.g., the driver's area, or the front passenger area) are to areas of the SUV.

7

it on the ground behind the SUV.  At 4:29:12, appellant and Franco were visible on the passenger side of the police car through reflections from the citizen's car, which was still trying to leave.  At 4:29:14, Hanou removed from the cargo area a gray rectangular box and, without opening it, put it on the ground.

From 4:29:22 to 4:30:21, Hanou, behind the SUV, removed from the cargo area a firearm case, removed a shotgun from the case, examined the shotgun, appeared to talk on a hand-held device, then put the shotgun back in the case and put the case on the ground.  During this period, appellant and Franco, at 4:29:28, were visible on the passenger side of the police car through their reflections from the citizen's car, and, at 4:29:50, Franco moved appellant back to the front of the police car.  From 4:30:26 to 4:30:34, Hanou appeared to continue to search the cargo area, then left the cargo area (although the view of portions of Hanou's actions during this period are blocked by appellant's body).  From 4:31:13 to 4:31:19, Hanou entered the driver's area, looked under the driver's seat, then left the driver's area.  (This is the first opportunity Hanou had to find the baggie of methamphetamine that, according to his preliminary hearing testimony, he found in the center console.)

(3)  *Events from the Initial Entry into the Left Rear Passenger Area to the Entry into the Red Luggage.*

Below are events from the time Hanou initially entered the left rear passenger area to the time he removed and entered the red luggage.  (There is no dispute this was the luggage in which, according to Hanou's preliminary hearing testimony, he found a baggie of methamphetamine.)  At 4:31:23, Hanou entered the left rear passenger area and appeared to search that area, and appellant's body blocked the view of Hanou's subsequent actions until 4:31:43.

At 4:31:43, Hanou was standing outside the left rear passenger side. He remained there until, at 4:31:53, he left that area. (Hereafter, we will refer to this period as period one. This was one of several periods, discussed below, that prolonged appellant's detention.) Hanou then walked around the front of the SUV and, from 4:32:19 to 4:33:08, appeared to search the right rear passenger area, then left that area. At 4:33:08, Hanou left the right rear passenger area, then walked to an area to the right of the police car and out of view until, at 4:36:03, he returned to the SUV from an area to the right of the police car. (Hereafter, period two.) From 4:36:09 to 4:36:33, Hanou, behind the SUV, again reached into the firearm case (which he earlier had put on the ground), retrieved documents from the case, and later returned them to the case. (Hereafter, period three). At 4:36:38, Hanou left the cargo area again.

After Hanou left the cargo area, Hanou, from 4:36:55 to 4:37:22, was using a hand-held device to talk with someone while he was standing outside the left rear passenger area and later walking to the front left corner of the SUV. From 4:37:22 to 4:37:23, he stopped using his hand-held device, then walked back towards the rear of the SUV. (Hereafter, period four.) From 4:37:27 to 4:38:18, Hanou was in the driver's area. From 4:39:52 to 4:41:14, the following occurred. Hanou left the SUV, then returned to appellant and talked to him. Hanou checked appellant's handcuffs and eventually escorted him towards the back of the passenger side of the police car and out of view. A sound of a car door is audible. Appellant is never again seen in the video.

From 4:41:26 to 4:41:49, Hanou quickly entered and exited the driver's area. From 4:41:51 to 4:41:59, Hanou, holding papers, walked towards the passenger side of the police car and out of view. (Hereafter, period five.) From 4:42:41 to 4:44:22, the following occurred. Hanou entered the driver's area. He later entered the left rear passenger area. Franco walked (without appellant) from the police car to the SUV and entered the driver's area. Both officers later concurrently exited the SUV. From 4:44:22 to 4:44:44, the officers conversed. (Hereafter, period six.) From 4:44:44 to 4:45:16,

9

Hanou, behind the SUV, entered the cargo area again, and Hanou removed from the cargo area a brown bag and put it on the ground.[7]

From 4:46:44 to 4:48:59, the following occurred. Hanou picked up the red luggage (which he earlier had put on the ground), put it in the cargo area, and made motions as if he was searching it (his back to the video camera). (This appears to be the first opportunity Hanou had to find the baggie of methamphetamine that, according to his preliminary hearing testimony, he found in luggage.) Hanou appeared to take an item from in front of him (from the area in which he had placed the red luggage) and put the item on the ground. Hanou then put the red luggage and items on the ground.

(4) *Subsequent Events to the Closing of the Cargo Door.*

From 4:49:03 to 4:50:52, the following occurred. Hanou took a gray item that was on or inside the open square box and made motions as if he was searching the gray item (his back to the video camera). He later left the cargo area. Hanou subsequently entered the right rear passenger area, then the right front passenger area. Hanou later entered the lower portion of the right front passenger area.

Hanou returned to the area behind the SUV and, at 4:53:18, searched the gray rectangular box, then, at 4:53:24, searched the open square box (each of which he earlier had put on the ground). At 4:54:10, Hanou closed the cargo door. On a number of occasions from the time appellant was last seen in the video to the time Hanou closed the cargo door, a person (presumably appellant) was clearing the person's throat in the police car.

b. *The Trial Court's Ruling.*

After argument at the special hearing, the court stated, inter alia, "based on the totality of the circumstances, and for the reasons very well articulated by [the magistrate] at the preliminary hearing, the court denies the 1538.5."

---

[7] Based on Hanou's testimony and the video, the brown bag was not a baggie in which he found methamphetamine.

10

3. *Analysis.*

Appellant claims the trial court erroneously denied his Penal Code section 1538.5 suppression motion.  He concedes the initial stop of the SUV for a Vehicle Code violation was lawful, but argues the prolonging of the stop of the SUV, and the search of the SUV, violated the Fourth Amendment.

a. *Hanou's Weapons Question Did Not Unlawfully Prolong the Stop.*

Appellant cites *People v. McGaughran* (1979) 25 Cal.3d 577 (*McGaughran*) and *Williams v. Superior Court* (1985) 168 Cal.App.3d 349 (*Williams*), for the proposition his detention was unlawfully prolonged where "Hanou, *after* obtaining all the information he needed in order to decide that appellant's license tags were in good standing, and a citation was therefore unnecessary, *chose to ask a series of investigative questions which were unrelated* to the suspected Vehicle Code violation."  (AOB/15)  (Italics added.)

Concerning prolonged detentions following traffic stops, *People v. Bell* (1996) 43 Cal.App.4th 754 (*Bell*), is instructive.  In *Bell,* an officer stopped a car for speeding.  Stewart was the driver and the defendant was a passenger.  The officer conversed with Stewart while writing a ticket, then gave Stewart the speeding ticket.  (*Id.* at pp. 757, 759.)  Stewart made statements leading the officer to suspect Stewart and the defendant were transporting drugs.  (*Id.* at pp. 757-758.)  The defendant claimed Stewart was unlawfully detained for questioning unrelated to the purposes of the traffic stop and Stewart's detention was unlawfully prolonged.  (*Id.* at pp. 758, 760.)[8]

*Bell* indicated the leading California case concerning the permissible scope of a traffic stop was *McGaughran.*  (*Bell, supra,* 43 Cal.App.4th at p. 765.)  *Bell* also discussed *Williams*, a similar case.  (*Bell,* at pp. 766-767.)

---

[8]     *Bell* earlier had concluded the defendant therein had "standing" to challenge the scope of Stewart's detention.  (*Bell, supra,* 43 Cal.App.4th at p. 765.)

11

*Bell* stated, "*McGaughran* and *Williams* indicate that investigative activities beyond the original purpose of a traffic stop are permissible as long as they do not prolong the stop beyond the *time* it would otherwise take. Federal cases are generally in accord." (*Bell*, *supra,* 43 Cal.App.4th at p. 767, italics added.) *United States v. Shabazz* (5th Cir. 1993) 993 F.2d 431 (*Shabazz*) was one of the federal cases cited by *Bell*. *Bell* later observed, "[t]he appellate court [in *Shabazz*], . . . stated, '[W]e reject any notion that a police officer's *questioning*, even on a subject unrelated to the purpose of the stop, is itself a Fourth Amendment violation. . . . Mere questioning . . . is neither a search nor a seizure.' (Citation.) [*Shabazz*] explained that the nature of the questioning during a detention might be relevant, but only as evidence of prolongation—'that the justification for the original detention no longer supports its continuation.' (Citation.)" (*Bell*, at p. 768, italics added; *People v. Brown* (1998) 62 Cal.App.4th 493, 496-500 [accord].) *Bell* later stated, "[h]ere, [the officer] testified that his 'conversation' with Stewart took place *while* he was writing the speeding ticket *and did not add to the delay otherwise resulting from the traffic stop*." (*Bell*, at p. 767, italics added.) *Bell* concluded the officer's questioning did not unlawfully prolong Stewart's detention. (*Id.* at p. 758.)

On the other hand, *Rodriguez v. United States* (2015) ___ U.S. ___ [191 L.Ed.2d 492] (*Rodriguez*), exemplifies an unlawfully prolonged detention. *Rodriguez* stated, "[t]his case presents the question whether the Fourth Amendment tolerates a *dog sniff* conducted *after* completion of a *traffic* stop. We hold that a police stop *exceeding the time needed to handle the matter for which the stop was made* violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged *beyond the time* reasonably required to *complete th[e] mission*' of issuing a ticket for the violation. [Citation.]" (*Id.* at p. ___ [191 L.Ed.2d at p. 496], italics added.) In *Rodriguez*, seven or eight

minutes elapsed from the time the canine officer issued the written warning to the time the dog alerted to the presence of drugs. (*Id.* at p. ___ [191 L.Ed.2d at p. 497].)[9]

In the present case, Hanou testified he asked for appellant's license, registration, and insurance, and "[appellant] *provided* the paperwork to me *and I asked* . . . if he had any weapons in the vehicle." (Italics added.) Hanou also testified he was asking appellant for documentation and "*he hands* the documents to [Hanou]" (italics added) *and* "*[a]t the same time*" (italics added), Hanou "*ask[ed]* [appellant] . . . if he has weapons in the car." (Italics added.) Thus, there was substantial evidence Hanou's activity of *asking* whether appellant had any weapons in the SUV occurred *while* Hanou was receiving documentation related to the traffic stop *and did not add to the delay otherwise resulting from the traffic stop.* Hanou's weapons question did not violate the Fourth Amendment by unlawfully prolonging appellant's detention.

Appellant argues the contrary as to Hanou's weapons question, citing the colloquy in which appellant's counsel asked Hanou, "And what was *the* basis of a traffic stop for registration violation after you determined the registration was valid?" (Italics added.) However, Hanou, in his *reply*, did not expressly state that, after he determined the registration was valid, the narcotics investigation was "the," i.e., the *sole*, basis for prolonging the stop. Our factual review is limited to determining whether substantial

---

[9]     A recent case, *United States v. Evans* (2015) 786 F.3d 779 (*Evans*), applied *Rodriguez.* In *Evans*, an officer stopped the defendant for traffic violations. *After* all tasks tied to those traffic violations had been, or reasonably should have been, completed, the officer detained the defendant while conducting an eight-minute ex-felon registration check, later indicated to the defendant that the defendant could go, but subsequently further detained him during a "dog sniff" of his car. (*Evans,* at pp. 782-784.) *Evans* stated, "[a]pplying *Rodriguez*, we hold that, by conducting an ex-felon registration check and a dog sniff, both of which were unrelated to the traffic violation for which he stopped Evans, [the officer] 'prolonged [the traffic stop] *beyond the time* reasonably required to complete' his traffic '*mission,*' and so violated the Fourth Amendment, unless there was independent reasonable suspicion justifying each prolongation. [Citation.]" (*Evans,* at p. 786, italics added.) *Evans* remanded to the district court to permit it to consider in the first instance whether reasonable suspicion justified each such prolongation. (*Id.* at pp. 788-789.)

evidence supported the express or implied factual findings of the magistrate. (Cf. *People v. Soun* (1995) 34 Cal.App.4th 1499, 1507.) There was, as previously discussed, substantial evidence Hanou properly asked the weapons question while he was investigating the Vehicle Code violation supporting the initial stop.

> b. *The Search of the SUV Was Unlawful.*

> (1) *Pertinent Law.*

Appellant also argues Hanou did not have "sufficient cause" to search the SUV. He argues, inter alia, "[t]he mere fact that appellant had a gun in his vehicle was not unlawful, and was not automatically an officer safety concern."

Concerning protective weapons searches, *Terry v. Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889] (*Terry*) discussed the Fourth Amendment contours of a lawful "protective seizure [of a person] and search for weapons" (*id*. at p. 29), and *Long,* relying on *Terry*, discussed when protective searches of *vehicles* for weapons are permissible under the Fourth Amendment.

In *Terry*, in pertinent part, an officer believed based on personal observations that the defendant Terry and two other men were involved in casing activity preparatory to a robbery likely to involve weapons. The officer approached the three, identified himself as a police officer, and asked for their names. When the men later mumbled something, the officer grabbed the defendant, spun him around, patted down the outside of his clothing, and felt a gun in his overcoat pocket. The officer reached in the pocket but was unable to remove the gun, so he later removed the defendant's overcoat and took the gun from the pocket. (*Terry, supra,* 392 U.S. at pp. 5-7, 28.)

*Terry* stated, "We . . . decide nothing today concerning the constitutional propriety of an *investigative* 'seizure' upon less than probable cause for purposes of '*detention*' . . . ." (*Terry*, *supra,* 392 U.S. at p. 19, fn. 16, italics added.) Instead, *Terry* focused upon whether a seizure of a person *for the purpose of searching for weapons*, and the later said search *for weapons*, i.e., a "protective seizure and search for weapons" (*id.* at p. 29), violated the Fourth Amendment.

The high court observed that "[t]he question is whether in all the circumstances of this on-the-street encounter, [Terry's] right to personal security was violated by an unreasonable search and seizure." (*Terry*, *supra,* 392 U.S. at p. 9.) *Terry* acknowledged arguments that police needed an escalating set of flexible responses, graduated in relation to the amount of information they possess. (*Id.* at p. 10.) However, *Terry* also acknowledged arguments that judicial acquiescence to the compulsive field interrogation techniques at issue would constitute "abdication of judicial control over, and indeed an encouragement of, substantial interference with liberty and personal security by police officers whose judgment is necessarily colored by their primary involvement in 'the often competitive enterprise of ferreting out crime.' " (*Id.* at p. 12.)

*Terry* later stated, "[the officer] 'seized' petitioner and subjected him to a 'search' when he took hold of him and patted down the outer surfaces of his clothing. We must decide whether at that point it was reasonable for [the officer] to have interfered with petitioner's personal security as he did. [Fn. omitted.] And in determining whether the seizure and search were 'unreasonable' our inquiry is a dual one -- whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." (*Terry, supra*, 392 U.S. at pp. 19-20.)

*Terry*, considering "the nature and extent of the governmental interests involved" (*Terry*, *supra,* 392 U.S. at p. 22), indicated there was a governmental interest in crime detention and prevention, and the officer properly approached the defendant to investigate a possible robbery. (*Ibid.*) However, *Terry* stated, "The crux of this case, . . . is not the propriety of [the officer's] taking steps to investigate petitioner's suspicious behavior, but rather, whether there was justification for [the officer's] invasion of Terry's personal security by *searching him for weapons* in the course of that investigation. We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." (*Id.* at p. 23, italics added.)

15

*Terry* later concluded, "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take *necessary* measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." (*Terry, supra,* 392 U.S. at p. 24, italics added.)

*Terry*, turning to "the nature and quality of the intrusion on individual rights" (*Terry*, *supra,* 392 U.S. at p. 24) noted "[a] search for weapons in the absence of probable cause to arrest, however, must, like any other search, be *strictly circumscribed* by the exigencies which justify its initiation. [Citation.] Thus it must be *limited* to that which is *necessary* for the discovery of weapons which might be used to harm the officer or others nearby." (*Id.* at pp. 25-26; italics added.) *Terry* later concluded "there must be a *narrowly drawn* authority to permit a reasonable search for weapons *for the protection of the police officer*, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that *his safety or that of others was in danger*. [Citations.]" (*Id.* at p. 27, italics added.)

*Terry* later discussed whether the defendant's "search and seizure . . . were reasonable, both at their inception and as conducted." (*Terry*, *supra*, 392 U.S. at pp. 27-28.) As to inception, *Terry* noted the officer believed the defendant was engaged in casing activity preparatory to an armed robbery, and that "on the facts and circumstances [the officer] detailed before the trial judge a reasonably prudent man would have been warranted in believing petitioner was armed and thus presented a threat to the officer's safety while he was investigating his suspicious behavior." (*Id.* at p. 28.) Accordingly, *Terry* indicated the officer's "decision at that point to seize Terry and pat his clothing *for weapons*" was not improper. Instead, *Terry* stated, "the record evidences the tempered act of a policeman who in the course of an investigation had to make a

16

quick decision as to how to protect himself and others from possible danger, and took *limited* steps to do so." (*Ibid.*, italics added.)

As to the manner in which the seizure and search were conducted, *Terry* stated, inter alia, "evidence may not be introduced if it was discovered by means of a seizure and search which were *not reasonably related in scope* to the justification for their initiation. [Citation.]" (*Terry, supra,* 392 U.S. at p. 29, italics added.) *Terry* observed, "[t]he *sole* justification of the search in the present situation is the protection of the police officer and others nearby, and it must therefore be *confined* in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." (*Ibid.*, italics added.)

*Terry* concluded the "scope of the search" (*Terry, supra,* 392 U.S. at p. 29) in that case presented no serious problem because the officer patted down the outer clothing of petitioner, felt a gun in the overcoat pocket, and then merely reached for and removed the gun. (*Id.* at pp. 29-30.) The officer "confined his search strictly to what was *minimally necessary* to learn whether the men were armed and to disarm them once he discovered the weapons. He did not conduct a general exploratory search for whatever evidence of criminal activity he might find." (*Id.* at p. 30, italics added.) *Terry* later observed the officer "*carefully restricted* his search to what was appropriate to the discovery of the particular items which he sought." (*Ibid.*, italics added.)

As mentioned, *Long* pertained to protective searches of vehicles. *Long* acknowledged at the outset that *Terry* did not "expressly address whether such a protective search for weapons could extend to an area beyond the person in the absence of probable cause to arrest." (*Long, supra,* 463 U.S. at p. 1034.) However, *Long* later stated, "[w]e hold that the protective search of the passenger compartment [at issue in *Long*] was reasonable under the principles articulated in *Terry* and other decisions of this Court." (*Id*. at p. 1035.)

17

In *Long*, a defendant speeding and driving erratically in a rural area after midnight drove his car into a ditch. The defendant, who had been the sole occupant of the car, met officers at the rear of the car and they asked for, inter alia, registration information. The door on the driver's side of the car had been left open. An officer thought the defendant appeared to be under the influence. The defendant began walking towards the open door of his car and the officers followed him and observed a long hunting knife on the driver's side floorboard. The officers conducted a patdown search which revealed no weapons. An officer, using his flashlight, illuminated the interior of the car to search for other weapons. After the officer saw something protruding from under the front seat armrest, he knelt in the car and lifted the armrest. The officer saw on the front seat an open pouch containing what appeared to be marijuana and subsequently arrested the defendant. Police decided to impound the car and found in the trunk 75 pounds of marijuana. (*Long, supra,* 463 U.S. at pp. 1035-1036.)

*Long* observed that principles in past high court decisions compelled the conclusion that "the search of the *passenger compartment* of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." (*Long, supra,* 463 U.S. at p. 1049, italics added.)

*Long* indicated that, under the circumstances in that case, the officers reasonably believed the defendant posed a danger if he were permitted to reenter his vehicle. (*Long, supra,* 463 U.S. at p. 1050.) *Long* then observed, "[t]he subsequent search of the car was restricted to those areas to which [the defendant] would generally have immediate control, and that could contain a weapon. The trial court determined that the leather pouch containing marihuana could have contained a weapon. . . . It is clear that the intrusion was 'strictly circumscribed by the exigencies which [justified] its initiation.' [Citation.]" (*Id.* at pp. 1050-1051, fn. omitted.)

18

*Long* later stated, "[i]n evaluating the validity of an officer's investigative or protective conduct under *Terry*, the '[touchstone] of our analysis . . . is always "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." ' [Citation.] In this case, the officers did not act unreasonably in taking preventive measures to ensure that there were no other weapons within [the defendant's] *immediate* grasp before permitting him to reenter his automobile. Therefore, the balancing required by *Terry* clearly weighs in favor of allowing the police to conduct an area search of the *passenger compartment* to uncover weapons, as long as they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous." (*Long, supra,* 463 U.S. at p. 1051, italics added.)

In *Long*, the high court concluded the officers could reasonably fear the defendant could injure them even if the defendant "was *effectively under their control* during the investigative stop and *could not* get access to any weapons that might have been located in the automobile." (*Long, supra*, 463 U.S. at p. 1051, italics added.) This was so because (1) a suspect in the defendant's position "might . . . break away from police control and retrieve a weapon from his automobile" (*ibid*.), (2) "if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside" (*id.* at p. 1052), or (3) "the suspect may be permitted to reenter the vehicle before the *Terry* investigation is over, and again, may have access to weapons." (*Ibid*.)[10]

---

[10] See *United States v. Holmes* (2004) 376 F.3d 270, 280, stating, "we hold that where a suspect is an occupant or recent occupant of a vehicle at the initiation of a *Terry* stop, and where the police reasonably believe the suspect may be dangerous and that there may be readily-accessible weapons in his vehicle, *Long* authorizes a protective search of the vehicle for weapons, provided the police harbor a reasonable belief that the suspect may gain access to the vehicle *at a time* when that access would endanger the safety of the officers conducting the stop or of others nearby -- including the reasonable belief that the suspect *will return to the vehicle* following the conclusion of the *Terry* stop." (Italics added.) (Accord, *United States v. Brown* (1998) 133 F.3d 993, 998-999.)

19

The Michigan Supreme Court had held that the search of the interior of the car at issue in *Long* was not justified as a protective search, and the marijuana taken from the trunk had to be suppressed as fruit of the illegal search of the car's interior. (*Long, supra,* 463 U.S. at p. 1037.) The high court, having held the protective search of the passenger compartment was proper, reversed the judgment of the Michigan Supreme Court and, since the latter court had not passed upon the issue of whether the search of the trunk was lawful under the Fourth Amendment, the high court remanded to permit a determination of that issue. (*Id.* at p. 1053.)

(2) *Application of the Law to the Facts.*

Appellant seeks suppression of (1) the methamphetamine Hanou found in the center console and (2) the methamphetamine and methamphetamine pipe Hanou found in the luggage in the cargo area. We note the sole reason Hanou gave as supporting his search of the passenger compartment and cargo area of the SUV was he was searching for a weapon for safety reasons, i.e., he was conducting a protective weapons search.[11]

(a) *The Methamphetamine Recovered from the Center Console Must Be Suppressed.*

The threshold issue is whether the initial search of the cargo area effected by the opening of the cargo door was justified as a protective weapons search. We have found no published California case upholding the search of such an area as a lawful protective weapons search. *Long*, of course, upheld a protective weapons search of the *passenger compartment* of a car that had a trunk. *Long* had no occasion to decide whether a cargo area such as the one in this case could be subjected to a lawful protective weapons search, and *Long's* holding does not control this case.

---

[11]     Of course, we realize " ' "[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." ' [Citation.]" (*People v. Woods* (1999) 21 Cal.4th 668, 680.)

Arguably, the risk to officer safety attending accessibility of a weapon located in a cargo area such as the one in this case is greater than the safety risk attending accessibility of a weapon located in a common trunk accessible only by a rear trunk door. Such a trunk is completely inaccessible from the passenger compartment, a fortiori, no one in the passenger compartment can reach inside such a trunk. On the other hand, the cargo area of the SUV was not completely inaccessible from the passenger compartment. Instead, Hanou testified to the effect the cargo area was immediately accessible to appellant in the sense the cargo area was immediately accessible from the passenger compartment (so that, e.g., if a person had been seated in the back seat, the person could have reached into the cargo area).

However, appellant was the driver and sole occupant of the SUV. Whether or not the cargo area was, in a general sense, immediately accessible from the passenger compartment, Hanou testified *appellant* could not reach the cargo area from the driver's seat and could not have reached the cargo area unless he climbed in the back. Moreover, the cargo area and a common trunk are alike to the extent they hold cargo and are not designed for driver or passenger seating. Absent any other consideration, if police have a driver exit the driver's side of a car, the driver, if released, will in all likelihood simply return to the driver's seat, not to a cargo area or trunk. There was no evidence that if appellant had been released, he would have headed towards the cargo area containing the shotgun, as opposed to the driver's side of the passenger compartment from which he had exited.

In *Long*, after the defendant exited his car, police ultimately followed him while, at night in a rural area, he was heading to the open door of his car that contained a long hunting knife on the driver's side floorboard. That is, the knife was in the passenger compartment. An officer, looking for additional weapons, saw an object protruding from under the front seat armrest, again, in the passenger compartment. After observing that object, the officer searched the passenger compartment. We note *Long*, stated, inter alia, "a *Terry* suspect in *Long's* position [might] break away from police control and retrieve a weapon from his automobile." (*Long, supra*, 463 U.S. at p. 1051, italics added.)

21

On the other hand, Hanou stopped appellant during the afternoon in a commercial area, and Hanou's testimony provided no evidence that it was more likely the firearm was in the cargo area than in the passenger compartment. Appellant's testimony that he told Hanou that "it" was in the "back" where it belonged did not make clear whether appellant was referring to the cargo area or the back seat. Nonetheless, Hanou first searched the cargo area. Unlike the defendant in *Long*, Hanou was in handcuffs virtually from the moment he exited the SUV.

Moreover, prior to any search of the SUV, Franco at one point (4:28:44) moved appellant from the front of the police car to its side to permit the citizen's car to exit. From 4:29:22 to 4:29:36, Hanou, behind the SUV, seized the firearm case from the cargo area, removed the shotgun from the case, and examined the shotgun. At 4:29:50, with Hanou behind the SUV and in possession of the shotgun, Franco *returned appellant to the front* of the police car, about a car length from Hanou. Appellant was even closer to the shotgun than he had been before it was removed from the cargo area, and there was ammunition in the cargo area, i.e., ammunition that, for all the record reflects, may have been shotgun ammunition. At 4:30:21, Hanou put the shotgun back in the case and put it on the ground *behind the SUV*, i.e., even closer to appellant, and with ammunition in the cargo area. Any weapons searches of the passenger's compartment for "safety" (including the search of the center console from which Hanou seized methamphetamine) occurred later.

We hold, first, that the initial search of the cargo area effected by the *opening* of the cargo door violated the Fourth Amendment and was not justified as a protective weapons search.[12] That initial search was not justified even at its inception.

_____

[12] We note that in *United States v. Arnold* (2004) 388 F.3d 237 (*Arnold*), the Seventh Circuit upheld, as a lawful *Long* protective weapons search, a search effected by an officer pulling down an armrest in the backseat of a car's passenger compartment where the armrest opened into the trunk. (*Id*. at pp. 238-241.) *Arnold* concluded "the boundaries of the passenger compartment under [*New York v. Belton* (1981) 453 U.S. 454 [69 L.Ed.2d 768] (*Belton*)] apply equally to the scope of a search under *Long*" (*Arnold*, at p. 240) (assuming an officer limited the protective weapons search to those areas that

22

Moreover, Hanou's subsequent *entry* into the cargo area was not reasonably related in scope to the circumstances which would have justified a protective search in the first place. (Cf. *Terry, supra*, 392 U.S. at pp. 19-20.) That entry was not a "necessary" measure (*id.* at p. 24) to determine if appellant was carrying a weapon and to neutralize the threat of physical harm (*ibid.*), was not an entry "*limited* to that which is *necessary* for the discovery of weapons which might be used to harm the officer or others nearby" (*id.* at pp. 25-26; italics added), and was not "minimally necessary" (*id.* at p. 30) to learn whether appellant was armed and to disarm him once appellant told Hanou that appellant had a firearm (cf. *ibid.*). The entry was not "*restricted* to those areas to which [appellant] would generally have *immediate* control" (*Long, supra*, 463 U.S. at p. 1050, italics added) and was not a preventive measure taken to ensure there were no weapons in appellant's "immediate grasp" (*id.* at p. 1051) if he had been permitted to reenter the SUV.

Although Hanou testified to the effect he recovered methamphetamine during a protective search of the center console, the video reflects that any entries by Hanou into the passenger compartment, and thus any entry into the center console containing methamphetamine, occurred only after the unlawful initial search of the cargo area effected by the opening of the cargo door. Accordingly, the methamphetamine Hanou recovered from the center console must be suppressed as tainted by the above-mentioned

---

might contain a weapon and to which the motorist might have access). *Arnold* cited federal appellate court cases that relied on *Belton* to hold "a search under *Belton* encompasses cargo spaces of sports utility vehicles, hatchbacks, and station wagons." (*Arnold,* at p. 240.) *Arnold* relied on those cases to conclude the search in *Arnold* was a lawful protective weapons search. (*Id.* at pp. 238-241.) However, *Arnold* is distinguishable from the present case. In *Arnold*, the officer stopped the car the defendant was driving, and *Arnold* noted that "[a]fter [the officer] observed Arnold turn around to look back at him, Arnold then wormed his way between the passenger and the driver's seats into the back seat. [The officer] testified that Arnold appeared to have been either retrieving or placing something in the back seat, although [the officer] could not see below Arnold's shoulders. Arnold then returned to the driver's seat." (*Id.* at p. 238.) The search effected by pulling down the armrest occurred later. (*Id.* at pp. 238-239.) Appellant did not do what the defendant did in *Arnold*.

unlawful initial search of the cargo area effected by the opening of the cargo door, and by the subsequent unlawful entry into the cargo area.

Second, the justification for the seizure of appellant to permit a protective weapons search of the *passenger compartment* did not support the initial search of the *cargo area*. Instead, Hanou's detention of appellant from the time the unlawful initial search of the cargo area began to the time Hanou found methamphetamine in the center console exceeded the time needed to handle the matter for which appellant properly could have been detained—a protective weapons search of the passenger compartment—and prolonged appellant's seizure beyond the time reasonably required to complete the mission of a protective weapons search of the passenger compartment. Accordingly, we hold the methamphetamine Hanou recovered from the center console must be suppressed because the seizure of that methamphetamine occurred during an unduly prolonged detention. (Cf. *Rodriguez, supra*, __ U.S. at pp. __ - __ [191 L.Ed.2d at pp. 496-497].)

Third, after Hanou opened the cargo door, but prior to any search of the passenger compartment (and therefore prior to any search of the center console for weapons), Hanou seized from the cargo area three items, i.e., the red luggage (at 4:29:01), an open square box (at 4:29:10), and a gray rectangular box (at 4:29:14). However, after engaging in numerous other searches and seizures and other activity, and near the end of the encounter, Hanou finally searched the red luggage at 4:46:44, i.e., about 15 minutes after he initially seized it. He later searched the gray rectangular box at 4:53:18, about 14 minutes after he initially seized it. He subsequently searched the open square box at 4:53:24, removing items from it, about 14 minutes after he initially seized it.

In other words, Hanou initially *seized* the above three items *to search* them, but only searched them about 15 minutes later. If Hanou had believed any of these three items contained a firearm that he needed to seize for safety reasons, he would not have waited so long to search them and would not have conducted the numerous other searches and seizures in the passenger compartment and other activities that the record clearly reflects he conducted in the interim. We hold the seizures of these three items violated the Fourth Amendment and were not justified as *protective* weapons seizures for officer

24

*safety*.  The methamphetamine subsequently seized from the center console must be suppressed as tainted by the illegal initial seizures of the above three items and because the seizure of that methamphetamine occurred during the unduly prolonged detention of appellant resulting from the unlawful initial seizures of those three items.

Fourth and finally, as mentioned, Hanou testified to the effect he recovered methamphetamine during a protective search of the center console, but the video reflects he searched the driver's area and right front passenger area multiple times, including, e.g., the driver's area at 4:42:41, i.e., 14 minutes after Hanou opened the cargo door. Thus, for all Hanou's testimony and the video reflect, it was during this search of the driver's area 14 minutes after Hanou opened the cargo door (and not during the first search of the driver's area that occurred at 4:31:13) that Hanou found the methamphetamine in the center console.  If so, this was not a *protective* search conducted for officer *safety*.  The burden was on the People to prove which search of the driver's area produced the methamphetamine in the center console (see *People v. Williams* (1999) 20 Cal.4th 119, 136) and the People failed to meet that burden.  For each of the above four independent reasons, the methamphetamine Hanou recovered from the center console must be suppressed.

(b)  *The Methamphetamine and Methamphetamine Pipe Recovered from the Luggage Must Be Suppressed.*

Reasoning similar to the above four points requires suppression of the methamphetamine and methamphetamine pipe (collectively, contraband) found in the luggage.  That is, first, the contraband Hanou recovered from the luggage must be suppressed as tainted by the above mentioned unlawful initial search of the cargo area effected by the opening of the cargo door, and by the subsequent entry into the cargo area to seize the luggage, an entry not reasonably related in scope to the circumstances which justified a protective weapons search.  Second, the contraband must be suppressed because its seizure occurred during an unduly prolonged detention resulting from the unlawful search of the cargo area.

Third, the contraband must be suppressed as tainted by the illegal seizures of the red luggage, open square box, and gray rectangular box and because the seizure of the contraband occurred during the unduly prolonged detention of appellant resulting from the unlawful seizures of those three items.

Fourth, at points during the period from the time Hanou opened the cargo door (at 4:28:55) to the time he seized the red luggage (at 4:46:44), Hanou (1) searched the driver's side five times and the left rear passenger area twice, (2) engaged in about five minutes of unexplained conduct (the previously identified periods one, two, and four through six; we note Hanou denied remembering using a cell phone), and (3) reached into the gun case and retrieved documents (period three) even though he had already searched the gun case for safety earlier. The contraband recovered from the luggage must be suppressed because the seizure of the luggage occurred during a detention unduly prolonged by the three above enumerated factors.

For each of the above four independent reasons, the contraband Hanou seized from the luggage must be suppressed. We will reverse the judgment with directions to the trial court to dismiss this case.[13]

> (c) *None of Respondent's Arguments Compel a Contrary Conclusion.*

Respondent argues the search of the SUV was justified by the vehicle search and search-incident-to-arrest exceptions to the warrant requirement. We disagree. "In [*Ross, supra,* 456 U.S. at p. 825], the court held that police who have *probable cause* to believe a lawfully stopped car contains contraband may conduct a warrantless search

---

[13]    The methamphetamine Hanou recovered from the center console and the methamphetamine and methamphetamine pipe he recovered from the luggage formed the evidentiary basis for appellant's convictions in this case. Respondent does not claim the People would be able to proceed absent this evidence. Remanding the matter for further proceedings other than dismissal would be an idle gesture. We will reverse the judgment with directions to the trial court to dismiss this case. (Cf. *People v. Dickey* (1994) 21 Cal.App.4th 952, 955, 957; see *McGaughran, supra*, 25 Cal.3d at p. 591 [reversing judgment after stating suppressed evidence "was essential to the case against defendant, and the ensuing conviction therefore cannot stand."].)

26

of any compartment or container in the car that may conceal the object of the search." (*People v. Diaz* (2011) 51 Cal.4th 84, 95, italics added.)  In *Gant,* the high court stated, "we hold that *Belton does not* authorize a vehicle search incident to a recent occupant's *arrest* after the *arrestee has been secured and cannot access the interior of the vehicle*." (*Gant*, *supra,* 556 U.S. 332, at p. 335, italics added.)  The fact a defendant is not formally arrested until after a search does not invalidate the search as incident to arrest if probable cause to arrest existed prior to the search and the search is substantially contemporaneous with the arrest.  (*People v. Adams* (1985) 175 Cal.App.3d 855, 861.)

Even if we assume that, just prior to the search of the SUV, Hanou had probable cause to arrest appellant, there was evidence that, before Hanou searched the SUV, (1) appellant had been handcuffed and escorted away from the SUV, and (2) appellant had been situated "on the front hood" of Hanou's police car (behind the SUV).  The search of the SUV was not authorized by *Gant* because the search occurred after appellant had been secured and could not access the interior of the SUV.

Moreover, *Ross* requires *probable cause to believe a* lawfully stopped *vehicle contains contraband*, and *Gant*, as indicated above, requires *probable cause* to arrest. We have set forth pertinent events preceding any search of the SUV.  Simply put, and notwithstanding respondent's argument to the contrary, prior to any search of the SUV, Hanou lacked probable cause to believe the SUV contained contraband and lacked probable cause to arrest.  Significantly, we note the mere fact an officer observes a firearm does not provide *probable cause* to believe it is *loaded* (cf. *People v. Muniz* (1970) 4 Cal.App.3d 562, 565-567) or, therefore, probable cause to believe the possessor of the firearm is committing the crime of carrying a loaded firearm (Pen. Code, § 25850, subd. (a)) or possessing the contraband of a loaded firearm.  There is no reason this should not be equally true where, as here, according to Hanou, appellant simply told him there was a firearm in the vehicle.

27

None of the additional facts, including the way appellant drove or his driving from one motel to another, the registration matter, the fact there were numerous motels in the area, Hanou's numerous past narcotics-related arrests in the area, the $10,000 found on appellant, or his refusal to consent to the search of the SUV, gave Hanou *probable cause* to believe the SUV contained contraband or *probable cause to arrest* appellant for purposes of *Ross* and *Gant*, respectively, therefore, the search of the SUV cannot be justified under *Ross's* vehicle search exception or *Gant's* search-incident-to-arrest exception.[14]

---

[14] During oral argument, respondent urged for the first time that a permissible protective search of the passenger compartment *would* have given Hanou probable cause to arrest appellant, therefore, an automobile search thereafter would have been permissible. However, nothing in this case compels a departure from the general prohibition against respondent advancing new theories on appeal (cf. *Lorenzana v. Superior Court* (1973) 9 Cal.3d 626, 640-641; but see *Green v. Superior* Court (1985) 40 Cal.3d 126, 137-138), therefore, we decline to consider respondent's new argument. We decline to consider it for the additional reason respondent made it for the first time during oral argument. (Cf. *People v. Mateljan* (2005) 129 Cal.App.4th 367, 376, fn. 4.) Finally, in light of our analysis, there is no need to address appellant's *Pitchess* claim.

### *DISPOSITION*

The judgment is reversed and the matter is remanded with directions to the trial court (1) to vacate its order denying appellant's Penal Code section 1538.5 motion to suppress the methamphetamine and methamphetamine pipe that Covina Police Officer Terrence Hanou testified he recovered from appellant's SUV, (2) to enter a new order granting that motion, and (3) to dismiss the case.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

JONES, J.[*]

We concur:

EDMON, P. J.

LAVIN, J.

---

[*]  Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.